UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| DNCSI SOLUTIONS LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5:19-cv-70 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| LANDMORE INC., *et al.*, | ) | By: Hon. Thomas T. Cullen |
| | ) | United States District Judge |
| Defendants. | ) | |

Plaintiff DNCSI Solutions, LLC, ostensibly a real-estate and sales-consulting company, sued its former clients Defendants Landmore Inc. and Isabella Enterprises, Inc., as well as their sole corporate shareholders, Kamran Heydari-Dastjerdi and Sheryl Rees Dastjerdi, for alleged failure to pay commissions and other compensation owed under the terms of three agreements. DNCSI also alleges that the Dastjerdis used the two corporate defendants to evade personal obligations and commit fraud by commingling personal and corporate assets, deliberately undercapitalizing the corporations, and failing to engage in corporate formalities. As such, DNCSI seeks to pierce the corporate veils of Landmore and Isabella to hold the Dastjerdis personally liable.

Defendants filed a motion to dismiss the entire Second Amended Complaint ("SAC") with prejudice under Federal Rule of Civil Procedure 12(b)(6). As explained below, Defendants contend, among other things, that DNCSI breached the terms of their main agreement and is therefore not entitled to any payment for the work it performed. The parties have fully briefed and argued the motion, and it is now ripe for disposition. The court

1

will grant in part and deny in part Defendants' motion to dismiss.

<u>BACKGROUND</u>

DNCSI is a Tennessee limited liability company, and its sole member, Stacey W. McLaughlin, is a citizen of Florida.[1] (ECF No. 73 ("Compl.") ¶¶ 3–4.) Isabella and Landmore are Virginia stock corporations with their principal places of business in Winchester, Virginia. (*Id.* ¶¶ 5–6.) Ms. Dastjerdi is the President, Secretary, and Director of Isabella, and the Treasurer of Landmore. (*Id.* ¶¶ 7–8.) Mr. Heydari-Dastjerdi is the Chief Financial Officer/Sales Manager and Director of Isabella, and the President of Landmore. (*Id.* ¶¶ 9–10.) The Dastjerdis are the only shareholders of Landmore and Isabella, and they are both Virginia citizens. (*Id.* ¶¶ 11–14.)

A.   **The First Agreement: The Commission Agreement**

DNCSI and Isabella entered into the first agreement—the "Commission Agreement"—on May 3, 2018. (*Id.* ¶ 18.) Under the Commission Agreement, DNCSI was to provide "broker services" for Isabella. (*Id.* ¶ 19.) Specifically, DNCSI was to secure a tenant for a property Isabella "would soon be purchasing" in Texas. (*Id.*) Under the agreement, Isabella would pay DNCSI a 5% commission of "the entire value of the lease agreement" between Isabella and the tenant. (*Id.* ¶ 20.) The commission was due when Isabella executed the lease with the tenant and received the first year's rent. (*Id.* ¶ 21.)

Over two months later, on July 25, 2018, Isabella executed the lease with the tenant for the Texas property, and the tenant issued a check to Isabella for the first year's rent. (*Id.* ¶¶ 25–26.) The entire value of the lease between Isabella and the tenant was $3,903,372.60.

---

[1] At the time this suit was filed, Jared McLaughlin was the sole member of DNCSI. (*Id.* ¶ 4.) He is also a citizen of Florida. (*Id.*)

(*Id.* ¶ 27.) DNCSI therefore alleges that it was entitled to $195,168.63—5% of the entire value of the lease agreement—under the Commission Agreement. (*Id.* ¶ 28.)

**B.      The Second Agreement: The Amended Commission Agreement**

On July 27, 2018, two days after Isabella executed the lease with the tenant in Texas, DNCSI and Isabella "amended the Commission Agreement in writing." (*Id.* ¶ 29.) The parties refer to this agreement as the "Amended Commission Agreement." (*Id.*) The Amended Commission Agreement consists of the same document as the Commission Agreement, with handwritten annotations and signatures on the bottom of the second page. (*See* ECF No. 1-2 at 108–09.) The handwriting reads:

> Amended on 7/27/18 Break $140,132.38 into 12 even [$]11,677.69 monthly commission [payments]. Upon lease signature, th[e] parties agree to extend current consulting contract Sept 1st 2018–August 31st 2019 @ base consulting fee of $8500.00 per month + 5% commissions on gross sales.

(*Id.* at 109.) DNCSI alleges that "[i]n consideration for withholding demand of the entire commission" owed under the Commission Agreement (allegedly $195,168.63), Isabella would pay DNCSI (1) $140,132.38 over 12 monthly installments ($11,677.69 per month); (2) $8,500 per month between September 2018 and August 2019; and (3) a 5% commission on gross sales "for future consulting and broker services from September 1, 2018, until August 31, 2019." (Compl. ¶ 30.)

**C.      The Third Agreement: The Independent Contractor Services Agreement**

On May 28, 2018—prior to the execution of the Amended Commission Agreement—DNCSI, Isabella, and Landmore entered into a separate written agreement, the "Independent Contractor Services Agreement." (*Id.* ¶ 22.) This agreement contemplated that

DNCSI would provide Isabella and Landmore "with sales consulting, contract consulting, and other various corresponding services to secure new business." (*Id.* ¶ 23.) DNCSI was to provide these various services for approximately three months, between June 1, 2018 and August 31, 2018. (*Id.*) Isabella and Landmore agreed to pay DNCSI 5% "of the gross contract value of any new business signed, payable 'net 7 days' after receipt of a signed contract and deposit check." (*Id.* ¶ 24.)

## D.   DNCSI's Performance and Defendants' Payment

DNCSI alleges that it provided "consulting and broker services [for] Defendant Isabella and Defendant Landmore" after July 27, 2018 (the date DNCSI and Isabella executed the Amended Commission Agreement) through January 2019. (*Id.* ¶¶ 31–34, 41.) Specifically, DNCSI alleges that it procured (1) $7,500 in new business for Isabella on August 14, 2018 for "concrete work"; (2) $85,000 in new business for Isabella in November 2018 for "HVAC installation"; and (3) $29,548 in new business for Isabella also in November 2018 for "various construction related services, including water line installation." (*Id.* ¶¶ 32–34.)

Defendants apparently made a series of payments under the agreements. First, in September 2018, Isabella paid DNCSI $22,901.74 "for expenses incurred by [DNCSI], the first installment payment under the Amended Commission Agreement, a consulting fee under a prior services agreement with Defendant Isabella, and a commission for concrete work that was secured in August[] 2018 under the Independent Contractor Services Agreement." (*Id.* ¶ 35.) Mr. Heydari-Dastjerdi also gave DNCSI "personal property, including a [one-ounce] gold bar and earrings, valued at $2,500 as payment towards future

invoices." (*Id.* ¶ 36.) Ms. Dastjerdi issued an $850 check to DNCSI "from her personal checking account for travel reimbursement that was promised to [DNCSI]." (*Id.*)

Second, in October 2018, Landmore paid DNCSI "the remaining balance of $18,826.23 towards the $21,326.23 invoice for expenses incurred by [DNCSI], the second installment payment under the Amended Commission Agreement, and the September 2018 consulting fee under the Amended Commission Agreement." (*Id.* ¶ 37.)

Third, also in October 2018, Mr. Heydari-Dastjerdi gave DNCSI "personal property[,] which was located in his residential safe, including 16 [ounces] of gold coins, valued at $20,800 as payment." (*Id.* ¶ 38.) The gold coins constituted "payment towards a $21,136.58 invoice for expenses incurred by [DNCSI], the third installment payment under the Amended Commission Agreement, and the October 2018 consulting fee under the Amended Commission Agreement." (*Id.*) DNCSI accepted the gold coins and additional "cash payments" from Mr. Heydari-Dastjerdi to satisfy the entire invoice. (*Id.*)

Finally, in November 2018, Mr. Heydari-Dastjerdi gave DNCSI "personal property which was located in his residential safe, including 18 [ounces] of gold coins, valued at $23,400 as payment towards a $29,069.36 invoice for expenses incurred by [DNCSI], the fourth installment payment under the Amended Commission Agreement, the November 2018 monthly consulting fee under the Amended Commission Agreement, and commissions for new business secured in November 2018." (*Id.* ¶ 39.) This was the fourth and final payment from Defendants to DNCSI. (*Id.* ¶ 40.)

## E.   DNCSI Discontinues Its Services

On January 11, 2019, when DNCSI realized that Defendants were not going to make

any further payments, it notified Defendants that it would "discontinue" its services. (*Id.* ¶ 42.) DNCSI also alleges that it decided to discontinue services because "Defendants had caused [DNCSI] to submit forged and fraudulent documents in the course of [its] services." (*Id.* ¶ 43.) Ms. Dastjerdi allegedly admitted to DNCSI that she possessed a "friend's notary stamp, would use the stamp, and would sign her friend's name when using the stamp." (*Id.* ¶ 44.) DNCSI also alleges that in December 2018, Mr. Heydari-Dastjerdi "corroborated" the forged notarizations. (*Id.* ¶ 45.)

## F.    The Instant Lawsuit

DNCSI brings four claims against Defendants. Count I is for breach of the Commission Agreement and the Amended Commission Agreement against Isabella for failure to pay all amounts due under the agreements and for causing DNCSI to submit forged documents in the course of its services. (*Id.* ¶¶ 46–62.) DNCSI seeks $175,572.41 in compensatory damages, 15% interest per annum on the amounts not timely paid by Isabella, costs, and attorney's fees. (*Id.* ¶¶ 60–62.) DNCSI brings Count II in the alternative for breach of the Independent Contractor Services Agreement against Isabella and Landmore, seeking $5,650.82 in compensatory damages. (*Id.* ¶¶ 63–70.) Finally, DNCSI seek to pierce the corporate veils of Landmore and Isabella as to the Dastjerdis (Count III) and as to each corporate entity (Count IV). (*Id.* ¶¶ 71–92.)

### MOTION TO DISMISS STANDARD

Motions to dismiss under Rule 12(b)(6) test the legal sufficiency of a complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). To survive a Rule 12(b)(6) motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a

claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007)). A claim is facially plausible when the plaintiff's allegations "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. While a complaint does not need "detailed factual allegations," complaints merely offering "labels and conclusions," "naked assertion[s] devoid of 'further factual enhancement,'" or "a formulaic recitation of the elements of a cause of action will not do." *Id*. (alteration in original) (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 555, 557.)

## ANALYSIS

### A.   Count I: Breach of the Commission Agreement and the Amended Commission Agreement

Defendants argue that DNCSI cannot recover under Count I because its agent was not licensed as a broker, sales agent, or attorney in Texas when DNCSI provided brokering services for Isabella. In other words, Defendants argue that the Commission Agreement and the Amended Commission Agreement are void because they violate the Texas Real Estate License Act ("TRELA"). DNCSI argues that TRELA does not apply because it partially owned the Texas property at issue or, to the extent TRELA does apply, the consulting fees and commissions in the Amended Commission Agreement are severable and enforceable in part.

### a.   Application of Texas Law

As an initial matter, the court must decide what law applies. This court has diversity jurisdiction over this matter under 28 U.S.C. § 1332(a). As such, the court must apply Virginia substantive law and federal procedural law. *See Gasperini v. Ctr. for Humanities, Inc.*,

518 U.S. 415, 427 (1996) (discussing the *Erie* doctrine). "Virginia law looks favorably upon choice of law clauses in a contract, giving them the full effect except in unusual circumstances." *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 624 (4th Cir. 1999) (citation omitted).

Here, both the Commission Agreement and the Amended Commission Agreement contain choice-of-law clauses, stating: "This Agreement shall be governed by and construed in accordance with the laws of the State of Texas."[2] (ECF No. 1-2 at 91, 109.) Defendants therefore correctly assert, and DNCSI does not dispute, that under Virginia law, this court should apply Texas law to any contractual disputes arising from the agreements.

    b.    <u>TRELA</u>

Under TRELA, "[u]nless a business entity holds a license issued under this chapter, the business entity may not act as a broker." Tex. Occ. Code Ann. § 1101.351(a-1) (West 2020). Relevant here, a "broker" is "a person who, *in exchange for a commission* or other valuable consideration or *with the expectation of receiving a commission* or other valuable consideration . . . negotiates or attempts to negotiate the listing, sale, exchange, purchase, or *lease* of real estate [or] procures or assists in procuring a prospect to effect the sale, exchange, or *lease* of real estate." *Id.* § 1101.002(1)(A)(iii), (xi) (emphasis added). Under TRELA, one

---

[2] The agreements also contain forum-selection clauses, stating: "Exclusive venue for all disputes under this Agreement is proper only in Harris County, Texas." (ECF No. 1-2 at 91, 109.) Because DNCSI filed suit in Virginia, DNCSI has waived forum selection as to the claims in this matter. *See In re Nationwide Ins. Co. of Am.*, 494 S.W.3d 708, 712 (Tex. 2016) ("[L]ike other contractual rights, a forum-selection clause may be waived."); *see also* W*achovia Bank Nat'l Ass'n v. EnCap Golf Holdings, LLC*, 690 F. Supp. 2d 311, 327 (S.D.N.Y. 2010) ("[W]hen a party disregards a forum selection clause and sues on a contract in an unauthorized forum, it waives the forum selection clause only for the specific claim it pursues.").

cannot pursue legal action "to collect compensation for an act as a broker or sales agent that is performed in [Texas] unless the person *alleges and proves* that the person was: (1) a license holder at the time the act was commenced; or (2) an attorney licensed in any state." *Id.* § 1101.806(b) (emphasis added).

Here, DNCSI alleges in the SAC that it "provided broker services to Defendant Isabella which were critical to securing a tenant . . . for real property Defendant Isabella would soon be purchasing [in Texas]." (Compl. ¶ 19.) DNCSI also alleges that under the Commission Agreement, Isabella agreed to pay DNCSI "a commission equal to [5%] for the entire value of the lease agreement between Defendant Isabella and [the tenant]." (*Id.* ¶ 20.) Moreover, the Commission Agreement and the Amended Commission Agreement label DNCSI as the "Broker," and state that "Broker has presented [the tenant] to Landlord [Isabella] and has and will render services on behalf of Tenant and Landlord in connection with the leasing of the Property to Tenant." (ECF No. 1-2 at 90, 108.) Finally, DNCSI admits in its opposition that it "does not have a real estate license, nor is it a licensed attorney." (ECF No. 78 at 4.)

Seizing on this, Defendants urge the court to look at the discovery the parties have conducted in support of their motion to dismiss. But "Rule 12(d) prohibits district courts from considering evidence outside the pleadings on motions to dismiss, unless the process is converted to summary judgment." *Caner v. Autry*, 16 F. Supp. 3d 689, 699 (W.D. Va. 2014) (citing Fed. R. Civ. P. 12(d)). District courts can, however, consider "documents attached to the complaint, as well as those attached to [a] motion to dismiss, so long as they are integral to the complaint and authentic," including documents "incorporated into the complaint."

*Bala v. Va. Dep't of Conservation & Recreation*, 532 F. App'x 332, 334 (4th Cir. 2013) (internal quotation marks omitted) (citing *Sec'y of State for Def. v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007)). Defendants attached DNCSI's interrogatory answers to their motion to dismiss, but they are neither "integral" nor incorporated into the SAC. The court declines to convert this matter into a summary-judgment proceeding and thus declines to consider the interrogatories for this motion to dismiss.

Presumably recognizing that TRELA would bar its breach-of-contract claim under Count I, DNCSI argues that TRELA does not apply because it had an ownership interest in the Texas property. DNCSI correctly notes that TRELA does not apply to "an owner or the owner's employee who leases the owner's improved or unimproved real estate." Tex. Occ. Code. Ann. § 1101.005(8). In support of this argument, DNCSI attached to its opposition a "Purchase of Real Property Agreement," executed on April 23, 2018, providing that DNCSI would have a "0.015% partnership interest" in the Texas property. (ECF No. 78-1.) As DNCSI's argument goes, because it owned part of the Texas property, it did not need to be a licensed broker, sales agent, or attorney in Texas to legally perform the brokering obligations under the Commission Agreement and the Amended Commission Agreement.

As noted above, the court cannot consider materials outside of the pleadings on a motion to dismiss without converting the motion to dismiss into a motion for summary judgment. *See* Fed. R. Civ. P. 12(d); *Bala*, 532 F. App'x at 334 ("[The court] may consider documents attached to the complaint, as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic." (citation omitted)). Here, the Purchase of Real Property Agreement was attached to the *plaintiff's* opposition, and DNCSI

never mentioned or incorporated the purchase agreement into the SAC. As such, it would be improper for the court to consider the purchase agreement at this juncture.

With this in mind, both parties have essentially waded into summary-judgment territory.[3] Under TRELA, the validity of the Commission Agreement and Amended Commission Agreement turns on whether DNCSI had a property interest *when it acted as a broker* for the Texas property, which is a factual dispute. Defendants' arguments in their reply miss the mark. They first argue that the purchase agreement was superseded by the Commission Agreement (executed on May 3, 2018). Even if that is true, it does not determine whether DNCSI owned part of the Texas property when it acted as a broker *prior to* the execution of the Commission Agreement. Defendants also argue that a "partnership interest" cannot constitute "ownership" under TRELA. This argument would require the court to analyze the purchase agreement, which is not permissible for purposes of this motion to dismiss.

The ownership issue differentiates this matter from cases where courts have dismissed complaints for failure to comply with TRELA. *See, e.g., Corp. Realty Assocs. v. Dun & Bradstreet, Inc.*, No. A-6-CV-921-LY, 2017 WL 4510592 (W.D. Tex. Feb. 17, 2017), *report*

---

[3] The court is aware that the parties have conducted some discovery and this motion to dismiss falls relatively late in this matter's procedural development. Both parties tried to introduce extraneous documents or discovery into the record before the court on this motion to dismiss. But the point of a motion to dismiss is to test the sufficiency of a complaint, not to adjudicate factual issues. *Edwards*, 178 F.3d at 243. The court notes that the determinative issue in this matter—whether DNCSI's 0.015% partnership interest in the Texas property constitutes ownership under TRELA, thereby rendering the Commission Agreement and Amended Commission Agreement enforceable—appears to be a matter of first impression under Texas law, and may be dispositive at summary judgment with a fully developed record.

*and recommendation adopted*, 2017 WL 4506811 (W.D. Va. May 1, 2017). In *Corporate Realty Associates*, the plaintiff brought suit for breach of contract, alleging that the defendant retained its services "to consult and negotiate" on the defendant's behalf to acquire office space. *Id.* at *1. Because of the plaintiff's services, the defendant decided to relocate its office and entered into a new lease. *Id.* The defendant, however, hired a different company "to act as its broker for the lease" and would not pay the plaintiff for any of its services. *Id.* The defendant moved for judgment on the pleadings, bringing the same argument that Defendants assert here: that the plaintiff failed to comply with TRELA because it provided brokering services without having a license in Texas. *Id.* The plaintiff argued that it provided "consulting," but not "brokering" services, and therefore TRELA did not apply. *Id.* at *1, 3. Upon review of the complaint, the magistrate judge determined that the plaintiff had engaged in brokering activities under TRELA. *Id.* at *3. The magistrate judge accordingly recommended granting the defendant's motion for judgment on the pleadings, and further recommended denying leave to amend because amendment would have been futile. *Id.* at *3–4.

While *Corporate Realty Associates* presents similar facts to this case, there are two critical distinctions. First, the plaintiff there did not allege that it owned the property for which it provided brokering services. Here, DNCSI alleges that it partially owned the property when it provided the brokering services in question. Second, the plaintiff in *Corporate Realty Associates* argued that it did not provide brokering services but claimed that it only provided "consulting" services. Here, DNCSI readily admits—and alleges repeatedly throughout the SAC—that it provided brokering services. If it were not for DNCSI's argument that it

12

partially owned the Texas property, rendering TRELA inapplicable, the result here would undoubtedly be the same as the result in *Corporate Realty Associates*.

DNCSI notes in its opposition that "it should not be incumbent upon Plaintiff to anticipate arguments and allege facts about statutes that do not apply." (ECF No. 78 at 3.) The court agrees. *See, e.g.*, *Packer ex rel. 1-800-flowers.com, Inc. v. Raging Cap. Mgmt., LLC*, 242 F. Supp. 3d 141, 146 (E.D.N.Y. 2017) (citing *Harris v. City of N.Y.*, 186 F.3d 243, 251 (2d Cir. 1999) ("A plaintiff's complaint should contain allegations that support her claim, but a plaintiff has no obligation to anticipate and refute potential affirmative defenses."); 5 Charles Alan Wright & Arthur Miller, *Federal Practice and Procedure* § 1276 (3d ed. 2020) ("On occasion, a plaintiff's complaint will contain allegations that seek to avoid or defeat a potential affirmative defense that he or she anticipates will be included in the responsive pleading; technically this is improper pleading because these allegations are not an integral part of the plaintiff's claim for relief and lie outside his or her burden of pleading."). Absent the TRELA affirmative defense, Defendants (rightly) do not argue that DNCSI failed to state a claim for breach of contract. Because the court cannot consider DNCSI's ownership interest as the proof falls outside the scope of Rule 12(b)(6) review, the court will deny Defendants' motion to dismiss as to Count I.

**B.     Count II: Breach of the Independent Contractor Services Agreement**

DNCSI pleaded Count II in the alternative "[i]n the event that this Court deems [that] the Commission Agreement and/or the Amended Commission Agreement do[] not apply to the commission[s] for new business secured by [DNCSI] in November[] 2018." (Compl. at 11.)

The Independent Contractor Services Agreement has a "start date" of June 1, 2018, and an "est[imated] completion date" of August 31, 2018. (ECF No. 1-2 at 93.) The agreement further states: "The initial Term of this Agreement begins with the start date shown above and ends with the 'Estimated Completion Date' shown above." (*Id.*) DNCSI does not allege that the parties amended the Independent Contractor Services Agreement at any time. The Independent Contractor Services Agreement also requires that Landmore and Isabella pay DNCSI "5.0% of The Gross Contract Value of Any New Business Signed, Due Payable Net 7 days via ACH Transfer After Receipt of a Signed Contract and Deposit Check." (*Id.*)

DNCSI alleges that Landmore and Isabella breached this agreement because they failed to pay (1) the commission earned in securing $85,000 in new business for HVAC installation in *November* 2018; and (2) the commission earned in securing $29,548 in new business for the water-line installation and other construction services also in *November* 2018. (Compl. ¶¶ 66–67.) DNCSI seeks $5,650.82 in damages for commissions earned under the Independent Contractor Services Agreement. (*Id.* ¶ 68.)

Defendants argue that DNCSI cannot recover under Count II because the Independent Contractor Services Agreement ended on August 31, 2018, and DNCSI seeks to recover for services it performed approximately three months later, in November 2018. DNCSI does not dispute that, on its face, the agreement ended in August 2018, but argues that "the parties understood that their contractual relationship continued past August 31, 2018." (ECF No. 78 at 5.) DNCSI further argues that its relationship with Isabella was "continued by the Amended Commission Agreement," and that DNCSI was still working

with Landmore through January 2019. (*Id.* at 6.)

    a.    <u>Application of Tennessee Law</u>

The Independent Contractor Services Agreement states: "This agreement, in all respects, shall be governed by the laws of the State of Tennessee applicable to agreements executed and to be wholly performed herein." (ECF No. 1-2 at 93.) As noted above, Virginia law gives full effect to choice-of-law clauses, except in unusual circumstances. *Hitachi Credit Am. Corp.*, 166 F.3d at 624. This court will accordingly apply Tennessee law.

    b.    <u>Continuation of the Contract by Tacit Consent</u>

DNCSI cites a single 1929 Tennessee Court of Appeals case to support the proposition that "Tennessee has acknowledged that agreements can be continued by tacit consent." (ECF No. 78 at 5 (citing *Bank of Com. & Tr. Co. v. North*, 11 Tenn. App. 519, 526–27 (1929)). In that case, the court examined the rights of partners under a limited-partnership agreement. *See generally Bank of Com. & Tr. Co.*, 11 Tenn. App. 519. The limited-partnership agreement expired on August 31, 1925, but the partners continued doing business together until December 1925. *Id.* at 521–23. The partners did not expressly renew the limited-partnership agreement, but they continued to do business together by "tacit consent." *Id.* at 523, 527. Accordingly, the Tennessee court held that the agreement continued to govern their respective rights. *Id.* at 526–27 ("[W]here the parties continue to operate the business without any change in their respective relations under the limited partnership contract, even though there is no express agreement that the business be so continued, yet, where the parties apparently by tacit consent, so continue the business, that their respective rights would be controlled by the articles of co-partnership, and as between

the partners the limited partnership contract would control."). DNCSI does not cite—and the court could not find—any other Tennessee or Sixth Circuit cases with a similar holding regarding commercial contracts (or other cases following the court's reasoning in *Bank of Commerce* as to limited-partnership agreements).

The court declines to extend the holding in *Bank of Commerce* because the facts in that case are inapplicable here. The Independent Contractor Services Agreement did not create rights in a partnership or other type of business association, and the parties were not running a business together. Moreover, holding a party liable for expenses incurred after a contract expired would drastically expand contract liability under Tennessee law, something this Virginia federal court is unwilling to do.

In sum, DNCSI seeks to recover commissions not bargained for, or agreed to, under the Independent Contractor Services Agreement. Further, neither DNCSI nor the court can identify any persuasive caselaw supporting the continuation of a commercial contract through the parties' tacit consent. The court will therefore enforce this contract as written and grant Defendants' motion to dismiss as to Count II. Because more artful pleading cannot save this claim, the Court dismisses Count II with prejudice.

## C.      Counts III and IV: Piercing the Corporate Veil

Defendants argue that the court should dismiss Counts III and IV because they are based on the alleged breach of either invalid (Count I) or inapplicable (Count II) contracts. Alternatively, Defendants argue that DNCSI has not pleaded sufficient grounds upon which this court can pierce the corporate veils of Landmore and Isabella. DNCSI argues that the contracts are valid, and that it has pleaded sufficient facts to support its claims.

a.    Application of Virginia Law

Piercing the corporate veil is a "follow-on" cause of action; it is a claim that determines who is liable (*i.e.*, shareholders and/or the corporate entity) for any damages stemming from another cause of action. *See Dodd v. Savino*, 426 S.W.3d 275, 291 (Tex. App. 2014) ("Alter ego, or piercing the corporate veil, is not an independent cause of action, but is instead a means of imposing liability for an underlying cause of action." (citation omitted)); *C.F. Trust, Inc. v. First Flight Ltd. P'ship*, 111 F. Supp. 2d 734, 742–43 (E.D. Va. 2000) ("[T]he alter ego doctrine is not an independent cause of action, but rather is a means for a complainant to reach a second corporation or individual upon a cause of action that otherwise would have existed only against the first corporation." (internal quotation marks and citation omitted)).

As discussed above, the court analyzed Count I under Texas law. Because Count I remains viable in this matter, and Count II does not, the court proceeds with the corporate veil-piercing analysis under Count I only and therefore must apply Texas law. The application of Texas choice-of-law rules, however, creates a boomerang effect. Under Texas law, corporate veil-piercing claims are determined by the law of the defendant-company's state of incorporation at the time of the alleged illegal act(s). *Weaver v. Kellogg*, 216 B.R. 563, 585 (S.D. Tex. 1997) ("Under the Texas choice of law rule, shareholder liability [under the alter ego doctrine] is determined by the law of the state of incorporation." (citation omitted)). Here, Landmore and Isabella are both Virginia corporations. Accordingly, by applying Texas law, the court must ultimately apply Virginia law.

b.      Piercing the Corporate Veil

Piercing the corporate veils allows a creditor of a corporation "to reach the assets of a corporate shareholder or director to satisfy a corporate debt." *C.F. Trust, Inc. v. First Flight Ltd. P'ship*, 306 F.3d 126, 134 (4th Cir. 2002) (citation omitted). Piercing the corporate veil is an "extraordinary" remedy, and it is only permitted in "exceptional circumstances when 'necessary to promote justice.'" *Id.* (quoting *Cheatle v. Rudd's Swimming Pool Supply Co.*, 360 S.E.2d 828, 831 (Va. 1987)). Corporate veil-piercing "is justified when the unity of interest and ownership is such that the separate personalities of the corporation and the individual no longer exist and to adhere to that separateness would work an injustice." *O'Hazza v. Exec. Credit Corp.*, 431 S.E.2d 318, 320–21 (Va. 1993). Virginia courts require the plaintiff to prove that "(i) the corporation is the alter ego, alias, stooge, or dummy of the individual, . . . and (ii) the individual used the corporation to evade a personal obligation, to perpetrate fraud or a crime, to commit an injustice, or to gain an unfair advantage." *C.F. Trust, Inc.*, 306 F.3d at 135 (citations and internal quotation marks omitted).

Here, as to Count III, DNCSI asserts that the Dastjerdis (1) commingled their personal finances with the corporate accounts of Landmore and Isabella; (2) deliberately undercapitalized Landmore and Isabella; (3) failed to engage in corporate formalities; (4) used Landmore and Isabella "to evade personal obligation, perpetuate fraud, commit injustice, and gain an unfair advantage." (Compl. ¶¶ 72–81.) As such, DNCSI alleges that Isabella and Landmore "served as the alter ego[s], alias[es], stooge[s], or dumm[ies] of the [Dastjerdis]." (*Id.* ¶ 80.) As to piercing the corporate veil between Isabella and Landmore, DNCSI alleges that the corporations (1) "routinely commingled their accounting, debts, and

obligations"; (2) were operated as the same enterprise; (3) paid each other's debts without consideration or benefit; (4) abandoned corporate formalities; (5) operated as alter egos, aliases, stooges, or dummies of the other; and (6) used each other to evade obligations and perpetrate injustice. (*Id.* ¶¶ 84–91.)

Specifically, DNCSI alleges that the Dastjerdis, on behalf of Landmore and Isabella, sometimes paid DNCSI with their personal property for business expenses. On one occasion, Mr. Heydari-Dastjerdi paid DNCSI with a one-ounce gold bar and earrings, and Ms. Dastjerdi gave DNCSI an $850 check issued from her personal banking account to pay for business expenses. (*Id.* ¶ 36.) On a second occasion, Mr. Heydari-Dastjerdi gave DNCSI "personal property which was located in his residential safe," including 16-ounces of gold coins, to pay for business expenses. (*Id.* ¶ 38.) Finally, on a third occasion, Mr. Heydari-Dastjerdi paid DNCSI with 18 ounces of gold coins from his residential safe for business expenses. (*Id.* ¶ 39.) DNCSI also alleges that Ms. Dastjerdi used her friend's notary stamp and signed her friend's name when using the stamp while conducting the business of Landmore and Isabella. (*Id.* ¶¶ 43–44.) This is a very serious allegation and one that, if proven true, could give rise to criminal liability. DNCSI states that it decided to terminate its services for Landmore and Isabella in part because they had "caused [DNCSI] to submit forged and fraudulent documents in the course of [its] services." (*Id.* ¶ 43.)

On a motion to dismiss, the court must construe the complaint in the light most favorable to the plaintiff and take the alleged facts as true. *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 627 (E.D. Va. 2000) (citation omitted). DNCSI has pleaded sufficient facts to state a "plausible" claim for piercing the corporate veils of Landmore and Isabella.

The SAC contains facts indicating that the Dastjerdis used money from their *personal* bank accounts, and gold coins and earrings taken from their *personal* residential safe to pay their *corporations'* business expenses. DNCSI further alleges that the Dastjerdis abandoned corporate formalities and used the corporate defendants to pay their personal obligations. In construing the SAC in the light most favorable to DNCSI, the court concludes that DNCSI has pleaded viable claims to pierce the corporate veils of Landmore and Isabella.

## D.   Identity of the Plaintiff

Finally, Defendants argue that it is unclear in the SAC who the plaintiff(s) is/are. Specifically, Defendants state that the SAC "also includes Stacey W. McLaughlin and Jared McLaughlin, who are purportedly current and prior members of [DNCSI], under the 'Parties' heading." (ECF No. 68 at 15.) Defendants argue that the term "Plaintiff" is used throughout the SAC but is never "specifically defined," and therefore it is unclear if Stacey and Jared McLaughlin are included as plaintiffs. (*Id.*) Defendants urge the court to dismiss the SAC because of this ambiguity.

This argument is unpersuasive. In the first sentence, the SAC identifies only DNCSI as the "Plaintiff." (Compl. at 1 ("Plaintiff, DNCSI Solutions, LLC, by counsel, pursuant to Federal Rule of Civil Procedure 15(a)(2), hereby submits this Second Amended Complaint.").) In the "Parties" section, the SAC discloses the members of DNCSI—Jared McLaughlin (the sole member at the time of filing) and Stacey McLaughlin (currently the sole member)—so that the court can confirm proper diversity jurisdiction over this matter.[4]

---

[4] An LLC is "an unincorporated association, akin to a partnership for diversity purposes, whose citizenship is that of its members." *Gen. Tech. Applications, Inc. v. Exro Ltda*, 388 F.3d 114, 121 (4th Cir. 2004).

(*See* Compl. ¶ 4.) Jared McLaughlin originally filed this matter *pro se*, and the Amended Complaint lists DNCSI and Jared McLaughlin as plaintiffs. (ECF Nos. 1-2 at 1, 13.) The SAC, however, does not list Jared or Stacey McLaughlin as plaintiffs, and the docket now reflects that Jared McLaughlin is a "terminated" party. It is unambiguous in the SAC that DNCSI is the only plaintiff, and the court will deny Defendants' motion to dismiss on these grounds.

### E.     Reasonable Attorney's Fees Under Texas Law

Defendants request that the court grant their reasonable attorneys' fees under Texas law. Defendants cite Texas Civil Practice & Remedies Code section 30.021, which states:

> In a civil proceeding, on a trial court's granting or denial, in whole or in part, *of a motion to dismiss filed under the rules adopted by the supreme court under Section 22.004(g), Government Code*, the court may award costs and reasonable and necessary attorney's fees to the prevailing party.

Tex. Civ. Prac. & Rem. Code Ann. § 30.021 (West 2020) (emphasis added).[5] Section 22.004(g) of Texas's Government Code requires the supreme court to "adopt rules to provide for the dismissal of causes of action that have no basis in law or fact on motion and without evidence." Tex. Gov't Code Ann. § 22.004(g) (West 2020).

The court will deny Defendants' request for attorney's fees. First, Defendants brought the motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), not a Texas Supreme Court rule providing for the dismissal of an action with no basis in law or fact. The above provision accordingly does not apply to this motion. Second, even if the rule applied, the rule is permissive, and no circumstances here warrant an award of attorneys' fees.

---

[5] In the motion to dismiss, Defendants omit the operative, italicized language in the statute.

21

DNCSI pleaded plausible claims under Counts I, III, and IV, and this action, for the reasons discussed above, is not frivolous or untethered from law and fact.

<u>Conclusion</u>

For the above reasons, the court will grant in part and deny in part Defendants' motion to dismiss (ECF No. 67). The court will dismiss Count II with prejudice and deny the motion in all other respects. A separate order will issue.

The clerk is directed to forward a copy of this Memorandum Opinion and the accompanying order to all counsel of record.

**ENTERED** this 20th day of November, 2020.


*/s/ Thomas T. Cullen*
_____
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE